# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACQUELINE C. RUPERT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-331 |
| | ) | |
| FORD MOTOR COMPANY, a foreign corporation, | ) | Judge Cathy Bissoon |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

### I. MEMORANDUM

Pending before the Court is Defendant Ford Motor Company's ("Defendant") Motion for Summary Judgment and Motion to Exclude Experts/Motion for a <u>Daubert</u> Hearing (Doc. 100). For the reasons stated herein, the Court will grant Defendant's motions. In summary, Defendant argues that: (1) the Court should exclude the testimony of Plaintiff's expert, Byron Bloch,[1] as he is not qualified as an expert and he fails to satisfy the <u>Daubert</u> reliability test; and (2) Plaintiff cannot meet her burden of establishing a "crashworthiness" products liability claim against Defendant, and thus Defendant is entitled to judgment as a matter of law. The Court finds that a subset of Mr. Bloch's conclusions is insufficiently reliable, and his testimony is partially excluded. Based on that exclusion, Defendant is entitled to judgment as a matter of law.

---

[1] In its Motion, Defendant also moves the Court to exclude the testimony of Plaintiff's fire origin expert, Cam Cope. At the <u>Daubert</u> hearing held on February 4, 2015, Defendant stipulated to the designation of Mr. Cope as an expert, and to the admissibility of his testimony. The Court only addresses arguments for the exclusion of Mr. Bloch's testimony in the instant Order.

## FACTUAL AND PROCEDURAL BACKGROUND

By way of factual background, Mr. Rupert was involved in a motor vehicle accident on May 27, 2010, in Adams Township, Pennsylvania, while driving a 1993 Ford F-250 pick-up truck (the "Rupert vehicle"). Def.'s Facts at ¶¶ 1-2 (Doc. 102). While driving along Route 228, Third Party Defendant Steven B. Macon caused his vehicle (the "Brayman vehicle") to cross the center line and strike the front area of the Rupert vehicle at a high rate of speed. Id. at ¶ 2. A third vehicle, which had been travelling behind Mr. Rupert, crashed into and beneath the rear of his truck. Id. at ¶ 4. Plaintiff contends that the passenger compartment of the Rupert vehicle was excessively crushed as a result of the accident, entrapping Mr. Rupert. Pl.'s Facts at ¶ 5 (Doc. 109). Defendant denies both that the vehicle was "excessively crushed" and that Mr. Rupert was entrapped. Def.'s Resp. to Pl.'s Facts at ¶¶ 5, 9 (Doc. 116). Various witnesses attempted to extricate Mr. Rupert from the vehicle, but none were successful. Pl.'s Facts at ¶ 7. A fire occurred post-impact, and Mr. Rupert sustained serious injuries. Id. at ¶ 8.

Original Plaintiffs Michael T. Rupert ("Mr. Rupert") and his wife, Jacqueline C. Rupert ("Mrs. Rupert"), both Pennsylvania residents domiciled in Pennsylvania, asserted claims against Defendant, a Delaware corporation with its principle place on business in Michigan, related to injuries Mr. Rupert sustained during the 2010 motor vehicle accident. Am. Compl. ¶ 1-14 (Doc. 23). In two separately filed amended complaints (Docs. 23 and 24), the original Plaintiffs asserted claims of strict product liability (Count I); strict liability – failure to warn (Count II); negligence (Count III); loss of consortium (Count IV); negligent infliction of emotional distress (Count V); and they seek punitive damages.[2] On December 31, 2013, the Court dismissed Mr.

---

[2] Original Plaintiffs filed two identical amended complaints – one on behalf of Mr. Rupert and the other on behalf of Mrs. Rupert. Counts I-III were brought by Mr. Rupert, and counts IV and V are brought by Mrs. Rupert. As the documents are identical, the Court will refer collectively to the "amended complaints," and cite to Doc. 23.

Rupert's claims against Defendant. (Docs. 60, 61). Plaintiff Jacqueline Rupert's claims against Defendant, Counts IV and V, remain.[3]

Defendant has moved to exclude the opinions of Plaintiff's proposed expert, Byron Bloch, and to grant summary judgment in favor of Defendant. Def.'s Mot. for Summ. J. at 2. In the alternative, Defendant requested a Daubert Hearing. Id. The Court granted Defendant's alternative request and held a Daubert hearing on February 4, 2015, during which Byron Bloch testified. Defendant continues to challenge Mr. Bloch's designation as an expert and the reliability of his conclusions, and moves for summary judgment.

## ANALYSIS

### Expert Designation

In support of her crashworthiness claim, Plaintiff retained Mr. Bloch as a design defect/crashworthiness expert. Id. at ¶ 10. Defendant challenges his designation as an expert in this area based on the "trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003). To be qualified as an expert, the witness must possess "specialized expertise," but the Court of Appeals for the Third Circuit has made clear that the requirement is a liberal one. Id.; In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir.1994) ("Paoli II" ) ("[A] broad range of knowledge, skills, and training qualify an expert as such.").

Mr. Bloch has over 40 years of automobile safety design experience; Defendant disputes the value of this experience and notes that he is not a licensed engineer. Pl.'s Facts at ¶ 11; Def.'s Resp. to Pl.'s Facts at ¶ 11. Mr. Bloch studied Science Engineering and Industrial Design from 1955-1961 at various Universities. Pl.'s Br. in Opp'n. at Ex. 2, p. 5 (Doc. 112). He holds a

---

[3] Hereinafter, "Plaintiff" refers only to Jacqueline Rupert.

Bachelor of Arts from the University of California, Los Angeles, where he majored in industrial design.  Id.; Transcript, Daubert Hearing, Feb. 4, 2014 ("Tr.") at p. 22.  From 1961 to 1966 he worked with a number of companies in the field of engineering.  Pl.'s Br. in Opp'n. at Ex. 2, p. 4-5.  Two of those jobs, in 1966 and 1967, related to automobiles.  Id. at 5.

For over forty years, Mr. Bloch has worked as an independent consultant in auto safety design and crashworthiness through his company, Byron Bloch, Auto Safety Design.  Tr. at 21.  From 1965 to 1968, Mr. Bloch worked as a research editor for Road TEST Magazine, evaluating the design and safety technology features of automobiles.  Pl.'s Br. in Opp'n. at Ex. 2, p. 2.  He worked with the National Safety Council as a judge, evaluating accident prevention research.  Id.  Between 1971 and the present, Mr. Bloch has testified and/or presented information regarding auto safety issues before the National Highway Traffic Safety Administration ("NHTSA"), the Department of Transportation ("DOT"), the U.S. House of Representatives, and the National Motor Vehicle Safety Advisory Council.  Id. at 8-9.  Intermittently, from approximately 1967 to 1999, he consulted with companies and news programs in the area of automobile safety.  Id. at 2.  From 1970 through the present, Mr. Bloch has lectured at colleges, universities and professional groups on auto safety issues.  Id.  Between 1968 and the present, he has testified as an automobile safety expert in approximately thirty cases in state and federal courts.  Id. at 3-4.  Mr. Bloch has published and/or presented on automobile/traffic safety approximately forty-four times.  Id. at 5-8.  In 2001, he received a "Lifetime Achievement Award" at the Twelfth Annual World Traffic Safety Symposium.  Id. at 5.

Through his work, Mr. Bloch has orchestrated, observed and/or analyzed vehicle crash tests on multiple occasions.  Tr. at 24-28.  His work with crash tests led to his recommendation to the automobile industry that they relocate fuel tanks away from the backs of vehicles, where they were easily ignited in collisions.  Id. at 26-27.  It is now the case that fuel tanks are located

4

in the "safety zone forward of the rear axle," reducing annual burn deaths from approximately 700 to less than 100. Id. at 26. He also specifically studied the risks of poor quality front seat anchoring and the merits of energy-absorbing safety bumper systems. Id. at 27-28.

Defendant insists that Mr. Bloch should not be deemed an expert under the Federal Rules of Evidence, as he lacks a formal degree in the field of engineering. Defendant's argument overlooks the Court of Appeals for the Third Circuit's position that Rule 702 imposes a "liberal" standard. Paoli II, 35 F.3d at 741. In Waldorf v. Shuta, the Third Circuit stated that:

> Rule 702 requires the witness to have "specialized knowledge" regarding the area of testimony. The basis of this specialized knowledge can be practical experience as well as academic training and credentials. We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony extends to the substantive as well as the formal qualifications of experts. However, at a minimum, a proffered expert witness. . . must possess skill or knowledge greater than the average layman. . . .

142 F.3d 601 (3d Cir. 1998) (internal citations omitted). It is plain from the written record, and Mr. Bloch's testimony, that he has specialized knowledge regarding vehicle design and safety, and crashworthiness, far greater than the average layman. He has worked in the field of automobile safety for decades, and has many times shared his expertise with legislative bodies and regulatory agencies, at their request. The Court finds that the record more than establishes Mr. Bloch's qualifications as an expert in the area of automobile safety, design and crashworthiness, despite his lack of a formal engineering degree or license.

### A. Daubert Reliability Inquiry

Federal Rule of Evidence 702 states:

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In addition to demanding sufficient qualifications, the Court of Appeals for the Third Circuit has interpreted Rule 702 to require that (1) the expert testify about matters requiring scientific, technical or specialized knowledge, and (2) the expert's testimony must assist the trier of fact. Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008).

While "Rule 702 . . . has a liberal policy of admissibility," it is also the case that the trial judge serves as a "gatekeeper." Id. at 243 (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)). With respect to the requirement that experts testify about matters requiring scientific, technical or specialized knowledge, "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." Id. at 244 (quoting Paoli II, 35 F.3d at 742). The standard for "reliability is lower than the merits standard of correctness." Id. at 247 (quoting Paoli II, 35 F.3d at 744). At the heart of a reliability analysis is an assessment of the methodology employed by the expert, not his or her ultimate conclusions. Id. A number of factors may be considered in order to assess the reliability of an expert's methodology, including, but not limited to:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Id. at 248. As stated, this list is not exhaustive, and the Court need not consider each of these, and only these, factors in every case; the Daubert inquiry under Rule 702 is a flexible one. Id.

Prior to issuing his report, Mr. Bloch examined: 1) the Rupert vehicle at issue in this case; 2) a "virtually identical" exemplar vehicle, which he sectioned in order to evaluate its

design features; and 3) the "Brayman vehicle," a 2009 F-150 pick-up truck. Pl.'s Br. in Opp'n. at Ex. 1, p. 3 (Doc. 110) (the "Bloch Report").

In his report, Mr. Bloch offers the following conclusions: 1) a properly designed vehicle should be designed and manufactured in such a way that occupants are not needlessly entrapped in the passenger compartment and subjected to a fire; 2) the failure to design and manufacture a vehicle to prevent the needless entrapment of occupants in the passenger compartment renders a vehicle not crashworthy; 3) the Rupert vehicle lacked six important features that the automotive industry, including Ford itself, have long-recognized as vital to the crashworthiness of the passenger compartment, features that were all available to and espoused by Ford as important and necessary components to a crashworthy passenger compartment; 4) the addition of six specified features to correct the six defects identified would have prevented the excessive crushing of the passenger compartment that occurred in the Rupert vehicle; and 5) had the passenger compartment not been excessively crushed, Mr. Rupert could have been extricated from the vehicle and not subjected to the fire that caused the majority of his injuries. Pl.'s Facts at ¶ 16; see also Bloch Report. Defendant admits that Mr. Bloch arrived at these conclusions, but disputes their substance.

The Court sees a distinction between the first of these three conclusions and the last two; they will be addressed separately.

*Conclusions One, Two and Three*

The Court finds that first three of Mr. Bloch's opinions are sufficiently reliable. These opinions relate to general precepts about automobile safety and design, the specific design features of the Rupert vehicle, the availability and feasibility of alternative designs at the time the Rupert vehicle was manufactured, and the general benefits of those alternative designs. They

7

naturally flow from Mr. Bloch's past experiences in the field of auto safety and from the work he undertook in this particular case – examination of the Rupert vehicle; dissection and examination of an exemplar vehicle; review of Ford design records; review of alternative designs; review of Insurance Institute for Highway Safety ("IIHS") crash tests; and review of Ford crash tests. Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000) (noting that in order to pass Daubert's reliability test, conclusions must flow naturally from the facts known to the expert and the methodology used) (citing Heller v. Shaw Industries, Inc., 167 F.3d 146, 153 (3d Cir. 1999)). As the Court finds them reliable, they are admissible at trial. Pineda, 520 F.3d at 243.

*Conclusions Four and Five*

The Court cannot justify the same finding with respect to Mr. Bloch's fourth and fifth conclusions. To reiterate, he opines that: 4) the addition of six specified features to correct the six defects identified would have prevented the excessive crushing of the passenger compartment that occurred in the Rupert vehicle; and 5) had the passenger compartment not been excessively crushed, Mr. Rupert could have been extricated from the vehicle and not subjected to the fire that caused the majority of his injuries. Pl.'s Facts at ¶ 16; see also Bloch Report. After extensive consideration of the methodologies Mr. Bloch employed to arrive at these conclusions, the Court finds that they are insufficiently reliable and, therefore, inadmissible at trial.

Much like the Court of Appeals for the Third Circuit in Oddi, we are not unsympathetic to the horrific injuries suffered by Mr. Rupert. 234 F.3d at 160. Further:

> [n]or [does] our holding suggest that every plaintiff must engage in such sophisticated and refined testing (including crash-testing) as to preclude a successful suit for damages for all but the wealthiest of plaintiffs or a group of plaintiffs sufficiently large to allow the economies and practicalities of class certification. The inquiry required under Daubert ought not to become an impenetrable barrier for plaintiffs with limited resources or restricted circumstances. As noted above, the Supreme Court reminds us that the "inquiry envisioned by Rule 702 is ... a flexible one." Daubert, 509 U.S. at 595, 113 S.Ct.

8

2786. It does not require the most elaborate or sophisticated tests or studies that can be imagined by opposing counsel.

Id. Nevertheless, an expert must testify to scientific, technical or specialized knowledge and "the process or technique the expert used in formulating the opinion [must be] reliable." Pineda, 520 F.3d at 244. Scientific knowledge requires "an inference or assertion . . . derived by the scientific method. Proposed testimony must be supported by appropriate validation— i.e., 'good grounds,' based on what is known." Daubert v. Merrell Dow Pharamaceuticals, Inc., 509 U.S. 579, 590 (1993). While the Court renders no opinion on precisely what methodology would have sufficed – and is unwilling to endorse the apparent position of Defendant that a crash test was necessary – it is clear that a scientific method was not used to arrive at the conclusions at issue here.

Mr. Bloch conducted no testing – hypothetical calculations or actual replications – to support his fourth conclusion: that his proposed alternative design features would have prevented the "excessive crushing" of the Rupert vehicle. During the Daubert hearing, he had difficulty explaining the methodology that he utilized to arrive at this conclusion, and the Court believes that the "methodology," largely, was an analysis internal to Mr. Bloch's brain. While he may be very intelligent, and possess an impressive wealth of knowledge that informed his thought-process, the Court is unable to find this "reliable" within the Daubert framework. The Court is aware that, ironically, Mr. Bloch's conclusions very well may be correct. Nonetheless, if the methods he utilized to arrive at those conclusions are not testable, or standardized, such that another expert in the field can critique his methods, utilize those same methods to arrive at an independent conclusion, or point to the rate of error of those methods, they are not "reliable." See e.g., Pineda, 520 F.3d at 248 (indicating that, *inter alia*, (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's

operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable, are factors that may be considered in a reliability analysis).

In order to conclude that the six alternative design features would have prevented the subjectively described "excessive crushing," Mr. Bloch must first reliably conclude, quantitatively, the extent to which the Rupert vehicle would have been crushed if it had included his recommended alternative designs. Mr. Bloch's testimony regarding the absence of door beams in the Rupert vehicle makes clear the dearth of information provided to the Court regarding the methodology he used to arrive at his conclusions. He testified that, without the door beam, the driver's side door was crushed by 10 inches in the impact of the accident. Tr. at 34. He then opined that adding a door beam would have reduced the crush by between six and ten inches. Id. at 35-36. When pressed by the Court as to how he arrived at that number, Mr. Bloch was unable to provide a satisfactory answer. Id. at 35-39. He did not explain any past testing or calculations to support his statement that the door beam would have reduced the crush by between six and ten inches. Id. Rather, he stated more generally that door beams reduced crush in industry crash tests; this does not suffice.

When asked what testing he – or anyone – conducted to support his conclusion that the six specified design changes would have altered the outcome in the Rupert accident, he replied that:

> I did not have to do, nor did I then do, any testing, nor say to the plaintiff, I need fifty thousand dollars. We have to buy a pickup. I have to do some crash tests. I didn't have to do that because, from my perspective, Your Honor, fifty years in the battlefields, and vehicle safety, and dealing with vehicle crash crashworthiness, writing about it, lecturing, teaching, on and on, it was clear that the use of these various features, which I'm hoping to illustrate to you in just a few minutes. I could show you all of them in a few minutes. And why it's as obvious as this.

> And if I may. If you're driving along and there is a guardrail. And the guardrail has a gap in it, at a curve in the road, and cars go through where the gap is and go over the cliff, and people are killed because there is a gap in the guardrail, you don't have to calculate the strength of the missing guardrail to know that it's a design blunder, it's a defective design, that there is a missing guardrail.

Id. at 32-33. However, it does not take an "expert" to determine that a road is qualitatively safer if bordered by a guardrail; this is not a matter requiring scientific, technical or specialized knowledge. Pineda, 520 F.3d at 244. It *does* take an expert to determine *how much* safer that road is, and if a specific guardrail would have altered the outcome of a particular accident. See id. One guardrail may prevent a car going five miles per hour from going off of a cliff, whereas that same guardrail may not prevent that outcome if the car is travelling at ten miles per hour. It is precisely the quantification of that improvement – how much better, in measured units? – which assists the jury in its determination of whether or not the improvement would have reduced the ultimate injuries in a given case. See id.

It appears that, instead of test results or calculations, Mr. Bloch's background and intuition inform his particular conclusions. As impressive as that background and base of knowledge are, they fail to provide a testable, reliable foundation for his conclusion under Daubert and its progeny. See e.g., id.; Cf., Oddi, 234 F.3d at 158 (holding that the expert "conducted no tests and failed to attempt to calculate the forces on Oddi or the truck during this accident, he used little, if any, methodology beyond his own intuition. There is nothing here to submit to peer review, and it is impossible to ascertain any rate of error for [the expert's] assumptions about the forces that cause Oddi's horrific injuries"). Mr. Bloch did not employ a testable method to arrive at his opinion that the crush of the passenger compartment would have been reduced by any specific measurable quantity *in this particular accident*. While the industry testing to which he cites demonstrates the general benefits of the alternative designs, it has not been established that they replicated the forces at play in this case – speed, angle, etc. – such that

he could state with a reasonable degree of scientific certainty how the outcome of Mr. Rupert's accident would have been different with the implementation of alternative designs. Mr. Bloch did not bridge the gap between the results in those crash tests or other accidents, and Mr. Rupert's accident. Without that bridge, his fourth conclusion is not reliable and does not assist the trier of fact. Pineda, 520 F.3d at 244. The Court finds his fourth conclusion to be inadmissible.

Mr. Bloch's submissions and testimony also cannot suffice with respect to his fifth conclusion: had the passenger compartment not been excessively crushed, Mr. Rupert could have been extricated from the vehicle before the fire reached the cab, avoiding the majority of his burn injuries. Daubert, 509 U.S. at 590 (noting that scientific knowledge results from the use of the scientific method). Such a conclusion rests on the premise that the crush of the cab was the but for cause for delay of Mr. Rupert's extraction. Mr. Bloch failed to demonstrate that but for the crush of the passenger cab, Mr. Rupert would have been able to exit the vehicle prior to the spread of the fire to the passenger compartment. He did not satisfactorily explain away the possibility that the locking of his seatbelt, Mr. Rupert's loss of consciousness, and/or his severe upper body injuries slowed his exit from the vehicle such that he would have been subjected to the fire even if the cab had been crushed less, or not at all. See tr. at 39-41, 45-51.

For example, when discussing the possibility that Mr. Rupert's seat belt served as an obstacle to his extrication from the vehicle, Mr. Bloch speaks generally about the function of seat belts rather than providing specific analysis of how the seat belt functioned with respect to this particular accident:

> So, what I'm saying to you is the seat belt that Mr. Rupert had on was not necessarily serving as a lock-down restraint that he couldn't have been pulled, even from under the seat belt that's on him. So, it's not a light switch where it's on or it's off. If a seat belt is on, you could still, for example, if you go to a vehicle today and sit in the vehicle, I think I could move you significantly from

12

under the lap belt portion of the seat belt, and the shoulder belt is anchored to the B pillar.

Tr. at 48. The Court does not find it reliable that Mr. Bloch concludes, from his general knowledge regarding seat belts and the ability of some persons to escape from beneath them at some times, that the seat belt did not serve as a significant obstacle to the extraction of *Mr. Rupert from his vehicle after this accident.* Mr. Bloch must do more than conclude that the seat belt did not "necessarily" lock Mr. Rupert into the cab of his vehicle. In order to opine, with a reasonable degree of scientific certainty, that the crush was the but for cause for delay of Mr. Rupert's extraction, Mr. Bloch must reliably conclude that it *was not* the seat belt that prevented Mr. Rupert from exiting the vehicle before the fire reached him.

Mr. Bloch does reach this conclusion, but he does not offer a reliable basis for doing so. He does not dispute the fact that, ultimately, no tools were used to assist in the removal of Mr. Rupert from his vehicle – other than a knife to cut his seat belt. Id. at 45-46. It appears that the basis for his conclusion, however, was his review of depositions, and an analysis in his own mind in light of his detailed knowledge of seat belts. This "method" is entirely unique to Mr. Bloch and his depth of knowledge. While that depth of knowledge is notable, the method itself is not testable, has not been subjected to peer review, has no identifiable rate of error, is not governed by maintained "standards", is not generally accepted, and has not been established to be reliable. Pineda, 520 F.3d at 248. At its core, it is Mr. Bloch's intuition. See Oddi, 234 F.3d at 158. The Court simply cannot find this to be "reliable" as contemplated by Daubert and its progeny.

Without a reliable determination that cab compression was the but for cause of the delayed removal of Mr. Rupert from the vehicle in the first place, it cannot soundly be concluded that a lessening of said compression would have resulted in him escaping the vehicle more quickly, thereby reducing his burn injuries. The Court finds that Mr. Bloch's methodology with

13

respect to his fifth conclusion is not reliable, and that conclusion is likewise inadmissible at trial. The Court genuinely respects Mr. Bloch's passion for automobile safety and does not doubt that his research and experience have led to his meaningful contributions in shaping regulatory and industry standards over the years. Nonetheless, he has not established the reliability of these particular conclusions, in this case, under the requisite standard. Paoli II, 35 F.3d at 743 (holding that Plaintiffs must show by a preponderance of the evidence that that an expert's testimony is reliable).

**Motion for Summary Judgment**

Defendant contends that Plaintiff cannot establish the requisite elements of a "crashworthiness" claim under Pennsylvania law. The "crashworthiness" theory, which is situated within the category of products liability, entails four elements. Plaintiff must prove that: (1) the design of the vehicle was defective; 2) when the design was made, an alternative, safer design was practicable under the circumstances; 3) what injuries, if any, the injured party would have suffered had the alternative, safer design been utilized; and 4) what injuries are attributable to the defective design. Bluebond v. Nu Trek, Inc. 1998 WL 472041 (W.D. Pa. 1998) (citing Harbecker v. Clark Equipment Co., 36 F.3d 278, 284 (3d Cir. 1994)).

Absent the full testimony of Mr. Bloch, there is no genuine issue of material fact with respect to what injuries Mr. Rupert would have suffered had his vehicle been alternatively designed, or what injuries are attributable to the defective design. The sole evidence Plaintiff proffered regarding the third and fourth elements of a crashworthiness claim was the inadmissible conclusions of Mr. Bloch. Without that testimony, Plaintiff has failed to establish a *prima facie* crashworthiness claim, and Defendant is entitled to summary judgment as a matter of law.

14

## II. ORDER

Consistent with the foregoing, Defendant's Motion to Exclude Experts (Doc. 100) is **GRANTED IN PART AND DENIED IN PART**; Defendant's Motion for Summary Judgment (Doc. 100) is **GRANTED**. Judgment is hereby entered in favor of Defendant.

**IT IS SO ORDERED**.

    s\Cathy Bissoon
    Cathy Bissoon
    United States District Judge

February 23, 2015

cc (via e-mail):

All counsel of record.